<u>Montgomery County, Maryland v. Jean K. Phillips, et al.</u>, Misc. No. 20, September Term, 2014

**AGRICULTURAL LAND TRANSFER TAX – MD. CODE ANN., TAX-PROP. (1986, 2012 REPL. VOL.) § 13-407(A) – "TOTAL RATE OF TAX" – MD. CODE ANN., TAX-PROP. (1986, 2012 REPL. VOL.) § 13-303(D) – SURCHARGE –** Court of Appeals held that "total rate of tax that applies to a transfer subject to the agricultural land transfer tax", as used in Md. Code Ann., Tax-Prop. (1986, 2012 Repl. Vol.) ("TP") § 13-407(a)(2) and (3), includes "surcharge" imposed by TP § 13-303(d), and that State surcharge is, by definition, part of State agricultural land transfer tax.

Circuit Court for Montgomery County
Case No. 380265V

Argued: September 10, 2015

IN THE COURT OF APPEALS

OF MARYLAND

Misc. No. 20

September Term, 2014

―――――――――――――――――――――――

MONTGOMERY COUNTY, MARYLAND

v.

JEAN K. PHILLIPS, ET AL.

―――――――――――――――――――――――

Barbera, C.J.
Battaglia
Greene
Adkins
McDonald
Watts
Harrell, Jr., Glenn T. (Retired,
Specially Assigned),

JJ.

―――――――――――――――――――――――

Opinion by Watts, J.
Greene and Harrell, JJ., dissent

―――――――――――――――――――――――

Filed:  October 16, 2015

Pursuant to Maryland Rule 8-304, the Court of Special Appeals certified this case to this Court. This Court issued a writ of *certiorari*, limiting review to the following question of law: "Does the phrase 'the total rate of tax that applies to a transfer subject to the agricultural land transfer tax' in [Md. Code Ann., Tax-Prop. (1986, 2012 Repl. Vol.) ("TP")] § 13-407(a)(2) and (3) [] include the 'surcharge' imposed by [TP] § 13-303(d)?"

We answer the certified question of law in the affirmative and hold that the total rate of tax that applies to a transfer subject to the agricultural land transfer tax, as set forth in TP § 13-407(a)(2) and (3), includes the State surcharge imposed by TP § 13-303(d). The State surcharge is, by definition, a part of the State agricultural land transfer tax, and must be calculated into, and treated as a part of, the tax ceiling on a county's agricultural land transfer tax.

## BACKGROUND

The following undisputed facts are set forth in the record. Jean K. Phillips, Trustee of the Jean K. Phillips Revocable Trust, and Carol Ann Mumma (together, "Appellees") owned the Phillips family farm in Montgomery County, Maryland ("the County"), Appellant.[1] The Board of Education of Montgomery County ("the Board of Education") condemned the Phillips family farm for the purpose of building an elementary school. The Board of Education and Appellees agreed that the just compensation for the Phillips family farm was $4,142,500.

The agricultural land transfer tax to be collected by the County, on the State's behalf,

---

[1]For purposes of proceedings in this Court, the parties retain the designations that they had in the Court of Special Appeals.

was calculated at the rate of 4% of the value of the agricultural portion of the land ($4,138,200—the just compensation of $4,142,500 less $4,300, which was the value of the non-agricultural portion of the land), arriving at a State agricultural land transfer tax of $165,528. The State surcharge of 25% of the State agricultural land transfer tax was calculated to be $41,382 (which is 25% of $165,528). In total, the amount of agricultural land transfer tax owed to the State was $206,910 (the State agricultural land transfer tax of $165,528 plus the State surcharge of $41,382).

The County calculated its own agricultural land transfer tax—or the County farmland transfer tax—at the rate of 2% of the just compensation of $4,142,500, arriving at a County farmland transfer tax of $82,850. Between the State agricultural land transfer tax, including the State surcharge, and the County farmland transfer tax, Appellees were taxed $289,760, which is approximately 7% of $4,138,200, which was the value of the agricultural portion of the land.

On January 14, 2013, on Appellees' behalf, the Board of Education paid the State agricultural land transfer tax of $206,910 and the County farmland transfer tax of $82,850. On January 16, 2013, the Board of Education paid $3,852,740—the remainder of the just compensation of $4,142,500—to Appellees' counsel in trust for Appellees.

In a letter dated February 1, 2013, Appellees requested from the Supervisor of Assessments for the County a refund of a portion of the County farmland transfer tax, specifically $41,468, plus interest. According to Appellees, the maximum amount of the combined State agricultural land transfer tax and the County farmland transfer tax permitted by law was 6% of $4,138,200 (the value of the agricultural portion of the land),

or $248,292, which was less than $289,760, which was the amount taxed. Appellees contended that the County, in calculating the County farmland transfer tax, was incorrect in concluding that the 25% State surcharge was not part of the combined transfer tax, and thus could be ignored when calculating the cap on the County's portion of the combined transfer tax. In a letter dated March 14, 2013, the County denied the request for a refund, explaining that its calculations satisfied the law because the State surcharge was to be imposed in addition to, and separate from, the combined transfer tax.

On March 21, 2013, Appellees appealed to the Maryland Tax Court ("the Tax Court"). Before the Tax Court, Appellees contended that the County farmland transfer tax needed to be reduced by the amount of the State surcharge. The County responded that the State surcharge was to be collected in addition to the State agricultural land transfer tax and the County farmland transfer tax; thus, the County was not required to reduce its farmland transfer tax rate by the amount of the State surcharge. Following a hearing, on August 7, 2013, the Tax Court issued a Memorandum and Order affirming the County's denial of Appellees' request for a refund. Specifically, the Tax Court ruled, in agreement with the County, that the State surcharge was "to be collected in addition to the State [agricultural land] transfer tax [] and the County [farmland] transfer tax[.]"

Appellees petitioned for judicial review. On February 21, 2014, the Circuit Court for Montgomery County ("the circuit court") reversed the Tax Court's decision, entered judgment in Appellees' favor, and ordered that the County "shall refund to [Appellees] the excess transfer tax imposed by [the] County upon the transfer of the [Phillips family farm] to the [] Board of Education in the amount of $41,468, plus interest from the date of

imposition to the date of payment."

The County appealed. The Court of Special Appeals considered the parties' briefs and heard oral argument, but, before reaching a decision, that Court certified this case to this Court. On January 23, 2015, this Court issued a writ of *certiorari*.

**STANDARD OF REVIEW**

In <u>Md. Econ. Dev. Corp. v. Montgomery Cnty.</u>, 431 Md. 189, 198, 64 A.3d 478, 483 (2013), we set forth the standard of review applicable to decisions of the Tax Court, stating: "[W]e are under no statutory constraints in reversing a Tax Court order which is premised solely upon an erroneous conclusion of law." (Citation and internal quotation marks omitted). <u>See also</u> <u>Green v. Church of Jesus Christ of Latter-Day Saints</u>, 430 Md. 119, 133, 59 A.3d 1001, 1009 (2013) ("As to [] legal error, the [respondent] asserts, the Tax Court is owed no deference. We agree with the [respondent]. The meaning of the words . . . is a matter of statutory construction and thus purely a legal question." (Citation omitted)); <u>Brown v. Comptroller of Treasury</u>, 130 Md. App. 526, 531-32, 747 A.2d 232, 235 (2000) ("A reviewing court will not accord deference to the tax court's decision on a question of law . . . and will review such a question *de novo*." (Citation omitted)).

Because the issue in this case involves statutory interpretation, we reiterate the pertinent rules of statutory construction:

> The cardinal rule of statutory construction is to ascertain and effectuate the intent of the [General Assembly].
>
> As this Court has explained, [t]o determine that purpose or policy, we look first to the language of the statute, giving it its natural and ordinary meaning. We do so on the tacit theory that the [General Assembly] is presumed to have meant what it said and said what it meant. When the statutory language is

clear, we need not look beyond the statutory language to determine the [General Assembly]'s intent. If the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written. In addition, [w]e neither add nor delete words to a clear and unambiguous statute to give it a meaning not reflected by the words the [General Assembly] used or engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning. If there is no ambiguity in th[e] language, either inherently or by reference to other relevant laws or circumstances, the inquiry as to legislative intent ends[.]

If the language of the statute is ambiguous, however, then courts consider not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives and purpose of [the] enactment [under consideration]. We have said that there is an ambiguity within [a] statute when there exists two or more reasonable alternative interpretations of the statute. When a statute can be interpreted in more than one way, the job of this Court is to resolve that ambiguity in light of the legislative intent, using all the resources and tools of statutory construction at our disposal.

If the true legislative intent cannot be readily determined from the statutory language alone, however, we may, and often must, resort to other recognized indicia—among other things, the structure of the statute, including its title; how the statute relates to other laws; the legislative history, including the derivation of the statute, comments and explanations regarding it by authoritative sources during the legislative process, and amendments proposed or added to it; the general purpose behind the statute; and the relative rationality and legal effect of various competing constructions.

In construing a statute, [w]e avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense.

In addition, the meaning of the plainest language is controlled by the context in which is appears. As this Court has stated, [b]ecause it is part of the context, related statutes or a statutory scheme that fairly bears on the fundamental issue of legislative purpose or goal must also be considered. Thus, not only are we required to interpret the statute as a whole, but, if appropriate, in the context of the entire statutory scheme of which it is a part.

Stoddard v. State, 395 Md. 653, 661-63, 911 A.2d 1245, 1249-50 (2006) (citations, internal

quotation marks, and paragraph break omitted) (some alterations in original).

**DISCUSSION**

The County contends that the State surcharge is a component of the State tax that is not included in the State agricultural land transfer tax rate, and, accordingly, the County farmland transfer tax is not reduced or otherwise affected by the amount of the State surcharge. Stated otherwise, the County argues that the State surcharge is imposed in addition to, and separately from, the State agricultural land transfer tax and the County farmland transfer tax. The County asserts that the County farmland transfer tax is derived solely from the State agricultural land transfer tax rate, without inclusion of the State surcharge. The County maintains that both the plain language and legislative history of the relevant statutes support the interpretation that the limit on the calculation of the County farmland transfer tax is based solely on the State agricultural land transfer tax rate and that the State surcharge does not affect the County farmland transfer tax rate. In other words, the County contends that TP § 13-407(a)(2) and (3)'s references to "the total rate of tax" do not include the State surcharge. Indeed, at oral argument, the County argued that the State surcharge is not a rate of tax. As such, the County contends that Appellees were not owed a refund.

Appellees contend that the plain language of TP § 13-407(a)(2) and (3) and the relevant County ordinance provide that a 6% tax ceiling applies to the total rate of tax, including the State surcharge, which is, by definition, a part of the State agricultural land transfer tax. Appellees argue that the County is required to reduce its farmland transfer tax in light of the State agricultural land transfer tax, including the State surcharge, so that the total transfer tax does not exceed 6%. Appellees contend that the County cannot overtax

at 7% by ignoring the State surcharge. Simply put, according to Appellees, the 6% tax ceiling on the combined State agricultural land transfer tax and the County farmland transfer tax includes the State surcharge, and the County is required to reduce its farmland transfer tax in light of the State surcharge to comply with TP § 13-407. As such, Appellees assert that they are entitled to a refund in the amount of $41,468, which constitutes the overcharge of the County farmland transfer tax, plus interest. We agree.

TP § 13-302(a) provides that, "[e]xcept as otherwise provided in [TP] § 13-305 . . . , [the State] agricultural land transfer tax is imposed on an instrument of writing that transfers title to agricultural land." Indeed, "[a]n instrument of writing subject to agricultural land transfer tax may not be recorded in any county" and "may not be filed with the [State] Department [of Assessments and Taxation]" "until the agricultural land transfer tax is paid to the collector for the county or paid to the [State] Department [of Assessments and Taxation]." TP § 13-302(c) and (d). Concurrently, the County collects its farmland transfer tax on property that has been "assessed at any time during the five years preceding the transfer on the basis of being actively devoted to farm or agricultural use." Montgomery County Code ("MCC") § 52-20(b)(1); see also MCC § 52-21(d).[2]

The State "agricultural land transfer tax" "means the tax imposed under" the Agricultural Land Transfer Tax subtitle (TP §§ 13-301–308) and "includes the surcharge imposed under [TP] § 13-303(d)[.]" TP § 13-301(c). And, pursuant to TP § 13-302(b),

---

[2]Pursuant to the Montgomery County Charter, the MCC was recodified in 2014. See Montgomery County Charter § 504; Preface to the MCC. The provisions at issue here, however, were recodified without substantial change; as such, we cite the MCC's current version.

the State "[a]gricultural land transfer tax is payable in addition to any other transfer tax imposed under" the Transfer Taxes title. The rate of the State agricultural land transfer tax depends upon the size and use of the property, with base tax rates ranging from 3% to 5%. TP § 13-303(a). Here, pursuant to TP § 13-303(a)(2), because the transfer involved "less than 20 acres of agricultural land assessed for agricultural use or as unimproved agricultural land," the base tax rate was 4%.

The State surcharge is also provided for in TP § 13-303, which is entitled "Rate of Tax." Specifically, TP § 13-303(d) provides:

> (1) Except as provided in paragraph (2) of this subsection, in addition to the tax imposed under this section, a surcharge in an amount equal to 25% of the tax determined under subsections (a) through (c) of this section is imposed on an instrument of writing that transfers title to agricultural land.

> (2) The surcharge imposed under paragraph (1) of this subsection does not apply to an instrument of writing that transfers property of 2 acres or less to be improved to a child or grandchild of the owner.

In the County, the revenue that the County must remit to the Comptroller of the State includes both the State agricultural land transfer tax and the State surcharge:

> If a county is certified by the Department of Planning and the Maryland Agricultural Land Preservation Foundation under § 5-408 of the State Finance and Procurement Article as having established an effective county agricultural preservation program, the collector for the county shall remit to the Comptroller:

> (1) the revenue from:

>> (i) the agricultural land transfer tax that is attributable to the taxation of instruments of writing that transfer title to parcels of land that are entirely woodland; and

>> (ii) the surcharge imposed under § 13-303(d) of this subtitle; and

- 8 -

(2) 25% of the balance of revenue from the agricultural land transfer tax that remains after the remittance under item (1) of this subsection.

TP § 13-306(b).  See also TP § 13-306(a)(1)(i) ("Except in Montgomery County and except as provided in subsection (b)(1) of this section for a certified county, each county collector shall remit from a special account to the Comptroller, as the Comptroller specifies: (i) the revenue from: 1. the agricultural transfer tax that is attributable to the taxation of instruments of writing that transfer title to parcels of land that are entirely woodland; and 2. the surcharge imposed under § 13-303(d) of this subtitle[.]"  (Paragraph breaks omitted));  TP § 13-306(a)(2)(i) ("In Montgomery County, if . . . a transfer tax . . . is in effect, the collector for [the] County shall remit to the Comptroller: (i) the revenue from: 1. the agricultural transfer tax that is attributable to the taxation of instruments of writing that transfer title to parcels of land that are entirely woodland; and 2. the surcharge imposed under § 13-303(d) of this subtitle[.]"  (Paragraph breaks omitted)).  In other words, under the current statutory scheme, the County retains 75% of the State agricultural land transfer tax, and remits 25% to the State.  See TP § 13-306(b)(2).  By contrast, other counties retain only one-third of the State agricultural land transfer tax, and must remit two-thirds to the State.  See TP § 13-306(a)(1)(ii).

Although permitting the County to impose its own transfer tax, the statutes place limits on the County's transfer tax.  Specifically, TP § 13-407, aptly titled "Limitations on county transfer taxes," provides in subsection (a) as follows:

(1) Unless a greater rate of tax was imposed before July 1, 1979, a county may not impose county transfer tax on a transfer subject to the agricultural land transfer tax under Subtitle 3 of this title at a rate greater than the county

- 9 -

rate applicable to the transfer of improved residential property in that county.

       (2) If a county has imposed a county transfer tax at a rate that exceeds the rate applicable to the transfer of improved residential property, the total rate of tax that applies to a transfer subject to the agricultural land transfer tax may not exceed 5% plus the rate that applies to improved residential property under the county transfer tax.

       (3) If the total rate of tax that applies to a transfer subject to the agricultural land transfer tax exceeds the maximum rate allowed under paragraph (2) of this subsection, the tax that applies to the transfer:

              (i) is payable at the rate specified for the agricultural land transfer tax; and

              (ii) the rate of the county transfer tax shall be reduced as necessary to comply with the 5% limit.

Thus, pursuant to TP § 13-407(a)(2), the agricultural land transfer tax ceiling, for any county, is "5% plus the rate that applies to improved residential property under the county transfer tax." Pursuant to MCC § 52-21(a)(3), the County's transfer tax rate on improved residential property is 1%, making the County's farmland transfer tax ceiling 6%. See also MCC § 52-20(b)(1) ("The rate of such tax shall not exceed[ s]ix percent of the value of the consideration for any transfer of land, excluding improvements thereon, which, while owned by the transferor, has been assessed at any time during the five years preceding transfer on the basis of being actively devoted to farm or agricultural use.").

Case law interpreting the relevant statutes is sparse. In Montgomery Cnty. v. Fulks, 65 Md. App. 227, 500 A.2d 302 (1985), however, the Court of Special Appeals construed TP § 13-407's predecessor—Md. Code Ann. (1957), Art. 81, § 278F. In Fulks, id. at 228-29, 500 A.2d at 303, the County imposed a 6% rezoning transfer tax, but failed to collect the 2% State agricultural land transfer tax; the County then sued the Fulkses to collect the

2% State agricultural land transfer tax. The Fulkses contended that Art. 81, § 278F(j) imposed a 6% ceiling on the combined State and County transfer taxes that arise from a single transaction and that, accordingly, they owed nothing further. Id. at 229, 500 A.2d at 303. At the time, Art. 81, § 278F(j) provided:

> A county may not impose **a local transfer tax on the transfer of land** subject to the provisions of this section at a rate that is greater than the local transfer tax applicable to improved residential property in that county. . . . A county may not impose a local transfer tax to a rate, or increase a local transfer tax to a rate, above the rate imposed as of July 1, 1979, on any land subject to the provisions of this section. Furthermore, in any county that has imposed a transfer tax at a rate in excess of the rate of transfer tax levied on improved residential property, **the combination of the state and local transfer tax rates may not exceed 5 percent plus the rate applicable to improved residential property.** If the combined rates exceed the maximum allowable rate, the tax imposed by this section shall be collected in full, and the local tax shall be reduced as required.

(Emphasis added). The Court of Special Appeals observed that, in tax matters, "Maryland courts often have been strict constructionists, relying heavily on the plain meaning of the words. They have also tended to favor the interpretation proffered by the taxpayer when the meaning of the statute is in doubt." Fulks, 65 Md. App. at 233, 500 A.2d at 305. The Court of Special Appeals held that Art. 81, § 278F(j) was "clear[,]" that "[t]here [wa]s no ambiguity in the phrase 'local transfer tax on the transfer of land[,]'" and that the County rezoning transfer tax was subject to the 6% tax ceiling imposed by Art. 81, § 278F(j). Id. at 235, 229, 500 A.2d at 306, 303. The Court of Special Appeals explained that the 6% tax ceiling applied to the entire tax applied to the transfer of agricultural land, stating: "The legislative intent plainly expressed is to place a cap on the total tax that may be enacted when land is transferred. In short, [the trial court] correctly held that [Art. 81,] § 278F(j)

- 11 -

is unambiguous and that it imposes a ceiling on a local transfer tax regardless of the rate imposed on the transfer by . . . the county code." Id. at 236-37, 500 A.2d at 307. Stated otherwise, the Court of Special Appeals explained that "the tax ceiling imposed by [Art. 81, § 278F(j)] is intended to mean exactly what its plain language states—the ceiling applies to the local transfer tax and all its varying rates." Id. at 236, 500 A.2d at 307 (citations omitted).

Here, in agreement with Appellees and the circuit court, we hold that the total rate of tax that applies to a transfer subject to the agricultural land transfer tax, as set forth in TP § 13-407(a)(2) and (3), includes the State surcharge imposed by TP § 13-303(d). We arrive at this conclusion through an examination of the plain language of the relevant statutes. By TP § 13-407(a)(2)'s and (3)'s plain language, the County farmland transfer tax is subject to and limited by the tax ceiling set forth in TP § 13-407(a)(3), which clearly states that if the "total rate of tax that applies to a transfer . . . exceeds" the tax ceiling set forth in TP § 13-407(a)(2)—which, for the County, is 6% (5% plus the rate that applies to improved residential property in the County, or 1%)—the County must reduce its farmland transfer tax "as necessary to comply with the" tax ceiling. As specifically provided in TP § 13-407(a)(2) and (3), the tax ceiling includes "the total rate of tax that applies to a transfer[.]" The total rate of tax is easily determined through a simple mathematical calculation, namely, dividing the total agricultural land transfer tax by the value of the agricultural portion of the land. Nothing in TP § 13-407 provides, explicitly or implicitly, that the tax ceiling is limited to the portion of agricultural land transfer taxes that is determined by base tax rates; i.e., nothing in TP § 13-407 provides that the State

surcharge—although not determined by base tax rates, but instead determined by multiplying the amount derived from the applicable base tax rate by 25%—is somehow excluded from the "total rate of tax that applies to a transfer[.]" To be sure, the State surcharge, although distinct from the base tax rate that is used to determine the State agricultural land transfer tax, is easily calculable because it is 25% of the amount of the tax calculated by applying the base tax rate to the value of the agricultural portion of the land. In other words, once the base rate of agricultural land transfer tax (here, 4%) is applied to the value of the agricultural portion of the land, that figure is then multiplied by the State surcharge rate of 25% to determine the amount due as a result of the State surcharge. Combining the State surcharge and the portion that is determined by application of the base tax rate yields the total State agricultural land transfer tax, as expressly defined by TP § 13-301(c).

Indeed, it is clear that, through its plain language, TP § 13-407 applies to transfers of property "subject to the agricultural land transfer tax under Subtitle 3 of this title[.]" TP § 13-407(a)(1). In other words, the limitations on a county's transfer tax are explicitly tied to Subtitle 3 of Title 13 of the Tax-Property Article, *i.e.*, the State's agricultural land transfer tax. Subtitle 3 of Title 13 expressly defines "agricultural land transfer tax" to include the surcharge imposed under TP § 13-303(d). TP § 13-301(c). Simply put, the definition of "agricultural land transfer tax" demonstrates a legislative intent that the State surcharge be considered a part of the agricultural land transfer tax, and, thus, a part of the "total rate of tax" imposed on a transfer of agricultural land.

Although Fulks did not concern the State surcharge, the reasoning of the Court of

Special Appeals easily supports the conclusion that the tax ceiling on the total rate of tax applies to the total tax that is assessed on the transfer of agricultural land, including the State surcharge. The Court of Special Appeals stated that "[t]he legislative intent plainly expressed [in TP § 13-407's predecessor] is to place a cap on the **total tax** that may be exacted when land is transferred." Fulks, 65 Md. App. at 236, 500 A.2d at 307 (emphasis added). A logical extension of that conclusion is that the "total tax" includes the State surcharge; otherwise, the tax ceiling set forth in TP § 13-407(a)(2) would be defeated. To be sure, TP § 13-407's predecessor, which was at issue in Fulks, contained the language "combination of the state and local transfer tax rates[,]" which became "total rate of tax" in TP § 13-407(a)(2) and (3). The change in phrasing from "combination of the state and local transfer tax rates" to "total rate of tax" does not alter the conclusion that the tax ceiling in TP § 13-407(a)(2) applies to "the total tax that may be exacted when land is transferred." Fulks, 65 Md. App. at 236, 500 A.2d at 307. Thus, the analysis of the Court of Special Appeals in Fulks instructs that TP § 13-407(a)(2)'s tax ceiling applies to the total agricultural land transfer tax, including the State surcharge.

That TP § 13-303 discusses the State surcharge and the base rate of the agricultural land transfer tax in separate subsections is of no consequence, and does not support the outcome that the State surcharge is separate from, and not included in, the agricultural land transfer tax. To be sure, TP § 13-303 provides in separate subsections for the base tax rate and the State surcharge, and states in TP § 13-303(d) that the State surcharge is "in addition to the tax imposed under this section[.]" To conclude, however, that the State surcharge is not a part of the State agricultural land transfer tax would be in direct conflict with TP §

- 14 -

13-301(c)(2), which explicitly and clearly provides that "'[a]gricultural land transfer tax' includes the surcharge imposed under § 13-303(d) of this subtitle." In other words, through TP § 13-301(c)(2)'s plain language, the General Assembly has expressed an intent to ensure that the State surcharge is a part of the agricultural land transfer tax and, thus, a part of the tax ceiling set forth in TP § 13-407(a)(2). To adopt the County's interpretation that the State surcharge is not included in the State agricultural land transfer tax would render nugatory the definition of "agricultural land transfer tax" in TP § 13-301(c)(2). We decline to read the statute in such a manner.

Moreover, it is of no moment that TP § 13-306(b)(1) directs the County under certain circumstances to remit to the State Comptroller the revenue from "(i) the agricultural land transfer tax" and "(ii) the surcharge imposed under [TP] § 13-303(d)[.]" TP § 13-306(b)(2) specifically provides that, in addition to the County's remittance of the agricultural land transfer tax and the State surcharge, the County must remit "25% of the balance of revenue from **the agricultural land transfer tax** that remains after the remittance under item (1) of this subsection." (Emphasis added). In other words, by its plain language, TP § 13-306(b) distinguishes between the remittance under item (1)—the agricultural land transfer tax determined by base tax rates and the State surcharge, which are lumped together—and the remittance under item (2) of the balance after remittance of item (1). Thus, the plain language confirms that the General Assembly intended the State surcharge to be a part of the State agricultural land transfer tax, and accordingly included the State surcharge in the "balance" of the State agricultural land transfer tax.

That the State agricultural land transfer tax and State surcharge are discussed or

- 15 -

listed separately is not surprising, given that they are based on separate calculations whose results are combined to arrive at the total tax. The State agricultural land transfer tax is 3%, 4%, or 5% of the value of the agricultural portion of the land, and the State surcharge is 25% of the amount that is calculated using the base tax rate. To the extent that the County contended at oral argument that the State surcharge is not a tax or a rate of tax, such a contention is incomprehensible.[3]

Indeed, as Judge McDonald pointed out during oral argument, a base tax rate is certainly a rate of tax, and, depending on the applicable base tax rate, the rate of the State surcharge itself will differ from case to case; in other words, the State surcharge is a rate of tax by a different name and a different calculation. As Judge McDonald stated, to compute the State surcharge, one must apply a rate; and, to arrive at the total rate of tax, one must examine both the base agricultural land transfer tax rate and the State surcharge. Moreover, the phrase "total rate of tax" itself, as set forth in TP § 13-407(a)(2) and (3), implies more than one component; otherwise, there would have been no need to refer to a "total" rate of tax. In sum, the plain language of the relevant statutes supports the conclusion that the agricultural land transfer tax, by definition, includes the State surcharge, and the State surcharge is to be considered as part of the "total rate of tax that applies to a transfer" of agricultural land for purposes of the tax ceiling set forth in TP § 13-407(a)(2).

Although the plain language of the relevant statutes is unambiguous and our analysis

---

[3]By definition, a surcharge may be a tax. See Surcharge, Black's Law Dictionary (10th ed. 2014) ("An additional tax, charge, or cost[.]"); Tax, Black's Law Dictionary (10th ed. 2014) ("A charge, usu[ally] monetary, imposed by the government on persons, entities, transactions, or property to yield public revenue.").

could end at this point, we nonetheless note that our holding is reinforced by the legislative history and purpose of the State surcharge provision. In 2008, the General Assembly passed Senate Bill 662, which added subsection (d) to TP § 13-303. See 2008 Md. Laws 4742, 4744 (Ch. 610, S.B. 662). Senate Bill 662's stated purpose was, among other things, to "impos[e] a certain surcharge under certain circumstances in addition to the agricultural land transfer tax imposed on certain instruments of writing[.]" Id. at 4742. Senate Bill 662's purpose was also "to increase agricultural land tax rates and alter the distribution of tax revenues" to "fund three [then-]unfunded rural land preservation programs." "SB 662 – Agricultural Land Transfer Tax – Rates and Distribution of Revenue," Senate Budget & Taxation Committee (Mar. 6, 2008) (testimony of Senator Thomas M. Middleton). As Senate Bill 662's sponsor Senator Middleton explained, the purpose of Senate Bill 662 was to generate State tax revenue that would "increas[e] available funding for rural land conservation easement purchases and [] provid[e] financial assistance to young and beginning farmers seeking to purchase farmland." Id. To raise that State tax revenue, Senator Middleton initially proposed to double the base tax rates set forth in TP § 13-303(a) from 3%–5% to 6%–10%. 2008 Md. Laws at 4744. Senate Bill 662 was revised, however, to impose the 25% State surcharge instead. Id.[4]

---

[4]As illustrative of the differences between the original Senate Bill 662 and its later version, consider a transfer of agricultural land with a value of $4,000,000 subject to a 4% tax rate. Under the original Senate Bill 662—doubling the 4% base tax rate to 8%—the State agricultural land transfer tax on the property would have been $320,000 (8% of $4,000,000). Under Senate Bill 662's later version, which the General Assembly passed— maintaining the 4% base tax rate and imposing the 25% State surcharge—the State agricultural land transfer tax on the property is $200,000 (4% of $4,000,000, or $160,000,

Senate Bill 662's bill file does not contain any discussion of increasing the total tax ceiling or shielding a county's agricultural land transfer tax from the effect of imposition of the State surcharge. Instead, as Senate Bill 662's summary explains, the purpose of the 25% State surcharge was wholly unrelated to the County's farmland transfer tax and was intended to generate State tax revenue without interfering with the counties' share of the State agricultural land transfer tax, and to provide for an exemption from the State surcharge increase for certain familial transfers:

> For ease of administration, the proposed tax increase would be levied as a surcharge on the existing collection. This approach will help accomplish two desirable objectives: 1) it will eliminate the need to tinker with the three existing tax levy rates, as well as[] the State/county distribution formulas; and 2) it will provide a means to easily exempt the owners of farm family/child lots from paying the increase in the tax, a provision that some farmers have requested.

This statement supports the construction of the relevant statutes that the State surcharge was intended to be a part of, and an increase in, the State agricultural land transfer tax, not a separate levy that would not be subject to the tax ceiling or would necessitate "tinkering" with the existing base tax rates.

Moreover, Senate Bill 662's Fiscal and Policy Note expressly states that there would be no effect in the State agricultural land transfer tax at the local level; in other words, the imposition of the State surcharge would not affect the share of revenue that the counties

plus 25% of $160,000, or $40,000). As Senator Middleton testified, he amended Senate Bill 662 to impose a 25% State surcharge instead so as to "leav[e] unaltered the three existing tax rates and two distribution formulas." "SB 662 – Agricultural Land Transfer Tax – Rates and Distribution of Revenue," Senate Budget & Taxation Committee (Mar. 6, 2008) (testimony of Senator Thomas M. Middleton).

received from the State agricultural land transfer tax.[5]  Simply put, the counties receive the same share of revenue after the State surcharge's imposition; the distribution formulas of TP § 13-306 have not changed, and the County still retains 75% of the State agricultural land transfer tax and needs to remit only 25% to the State.  In short, we are not persuaded that inclusion of the State surcharge in the total rate of tax results in a loss of revenue to the County.[6]

Finally, Senate Bill 662's file contains a letter from the Maryland Association of Counties, Inc. ("MACo") to the Senate Budget & Taxation Committee in support of Senate Bill 662.  MACo expressly supported the increase in State taxes in the form of a surcharge so that the counties would continue to receive the same amount of State tax revenue from the existing base rates, and wrote:

> MACo is also aware of concerns with the substantial fiscal note on this legislation, and a desire to identify funding of these State programs.  A

---

[5]At oral argument, the County's counsel seemingly conceded that Senate Bill 662's Fiscal and Policy Note "would've taken into account if counties' agricultural transfer tax revenue w[ere] reduced," and, as explained, Senate Bill 662's Fiscal and Policy Note specifically states that establishment of the State surcharge would have no local effect; *i.e.*, the Fiscal and Policy Note makes no mention of a reduction in revenue to the counties through imposition of the State surcharge.

[6]As Judge McDonald observed during oral argument and as Appellees pointed out in their brief, the level or amount of the County farmland transfer tax is controlled by what the County does in terms of its tax on residential property, and Senate Bill 662's Fiscal and Policy Note would not necessarily have taken into account what each specific county did in terms of its tax on residential property.  In other words, the 6% tax ceiling under TP § 13-407(a)(2) is, in part, of the County's own making.  TP § 13-407(a)(2) defines the tax ceiling as "5% plus the rate that applies to improved residential property under the county transfer tax[,]" which, here, is 1%.  Should the County desire to generate additional revenue on the transfer of agricultural land and increase the 6% tax ceiling imposed by TP § 13-407(a)(2), the County can do so by increasing the rate that it imposes on the transfer of improved residential property, which will in turn increase the tax ceiling under TP § 13-407(a)(2).

> bill structured as a State-only surcharge to the existing agricultural transfer tax, leaving the county share of collections unaffected, would not harm existing county programs. MACo would be open to working with the Committee on such a redirected bill.

In other words, MACo supported the State surcharge method as a means of raising additional State tax revenue without any reduction of the counties' share of State tax revenue. In so writing, MACo identified the State surcharge as part of the "existing agricultural transfer tax" and not as a separate tax.

The legislative history of the 2008 amendment to the State agricultural land transfer tax supports our reading of the pertinent statutes that the total rate of tax that applies to a transfer subject to the agricultural land transfer tax of TP § 13-407 includes the State surcharge imposed by TP § 13-303(d). The legislative history demonstrates that the State surcharge is to be collected and distributed directly to the State, and makes no mention whatsoever that the State surcharge is somehow exempt from the tax ceiling on the "total rate of tax" under TP § 13-407(a)(2). Through Senate Bill 662, the General Assembly clearly intended that the State surcharge be a part of the agricultural land transfer tax—and it even expressly defined "agricultural land transfer tax" as including the State surcharge. Tellingly, the General Assembly could have, but did not, modify or otherwise raise the tax ceiling on the combined State agricultural land transfer tax and county agricultural land transfer tax that may be imposed. Absent any indication in the statutory language or the legislative history that the General Assembly did not intend the State surcharge to be a part of the State agricultural land transfer tax, we decline to construe the relevant statutes to reach such a strained result.

In sum, TP § 13-301(c)'s plain language provides that "agricultural land transfer tax" includes the State surcharge imposed under TP § 13-303(d). TP § 13-407(a)(2) limits a county's transfer tax and imposes a tax ceiling on the combined rates of tax charged by the State and a county. When amending the agricultural land transfer tax statutes, the General Assembly added the State surcharge as part of the State agricultural land transfer tax, but did not modify the tax ceiling. Plainly put, the State surcharge is, by definition, a part of the State agricultural land transfer tax, and must be calculated into, and treated as a part of, the tax ceiling limiting a county's agricultural land transfer tax. Accordingly, Appellees are entitled to a refund in the amount of $41,468—the overcharge of the County farmland transfer tax—plus interest.

**CERTIFIED QUESTION OF LAW ANSWERED. CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY. APPELLANT TO PAY COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS.**

IN THE COURT OF APPEALS
OF MARYLAND

Misc. No. 20

SEPTEMBER TERM, 2014

---

MONTGOMERY COUNTY, MARYLAND

v.

JEAN K. PHILLIPS, ET AL.

---

Barbera, C.J.,
Battaglia,
Greene,
Adkins,
McDonald,
Watts,
Harrell, Glenn T., Jr. (Retired, Specially
                                    Assigned),
                        JJ.

---

Dissenting Opinion by Harrell, J.,
which Greene, J., joins.

---

Filed:   October 16, 2015

With respect, I dissent.

The Majority opinion claims to be applying the plain meaning of the relevant statutory scheme ("We arrive at this conclusion through an examination of the plain language of the relevant statutes." Maj. slip. op. at 12) and turns to legislative history only to ratify the conclusion reached by its plain meaning analysis ("Although the plain language of the relevant statutes is unambiguous and our analysis could end at this point, we nonetheless note that our holding is reinforced by the legislative history and purpose of the State surcharge provision." Maj. slip op. at 16-17). I see the structure of the appropriate analysis a little differently. I submit that the statutory scheme is ambiguous and resort to legislative history is both necessary and dispositive. As the Majority opinion concedes necessarily, "TP § 13-303 provides in separate subsections for the base tax rate and the State surcharge, and states in TP § 13-303(d) that the State surcharge is "in addition to the tax imposed under this section[.]" Maj. slip op. at 14. That alone appears to me to be an ambiguity in the statutory scheme, frustrating a plain meaning approach to statutory interpretation and forcing recourse to traditional extrinsic aids in meeting the challenge of interpreting the somewhat complex regulatory provisions.

Turning to the Majority opinion's analysis of the legislative history of Senate Bill (S.B.) 662 of 2008 (the key enactment), the Majority contends that "the purpose of the 25% State surcharge was *wholly unrelated* to the County's farmland transfer tax and was intended to generate State tax revenue *without interfering* with the counties' share of the State agricultural land transfer tax . . ." (Maj. Slip Op. at 18). Continuing, the Majority opinion professes not to be "persuaded that inclusion of the State surcharge in the total

rate of tax results in a loss of revenue to the County." Maj. Slip. Op. at 19 (footnote omitted). I may not grasp completely the Majority's reasoning (and for that, I apologize), but, if that were the case, how is it then that the result reached by the Majority opinion (in construing the surcharge as part of the tax rate and applying the tax ceiling provision) is that the County is ordered to refund to Phillips $41,468 it had collected from Phillips, in accordance with the way the State and County had applied the regulatory scheme since 2008? Clearly, the County is losing revenue it would have received, but for S.B. 662 and how the Majority interprets the calculation of the tax rates and ceiling. As the Tax Court paraphrased Phillip's argument, "[b]y adding the State surcharge to the State agricultural transfer tax, the rate of the County farmland transfer tax will be reduced and the amount of County farmland tax the County receives is reduced by the amount of the surcharge." Tax Court Memorandum And Order at 3. Although it could be seen as an "apples and oranges" analysis, I see it has sleight-of-hand that injures the County in a way not intended by the Legislature.

If the Majority's view that S.B. 662 (in combination with the pre-existing tax rate and ceiling provision) was not intended to diminish the County's share of the tax revenue in these circumstances, why did Senator Middleton (Sponsor of S.B. 662) state, seemingly that the bill was to "leav[e] unaltered" otherwise the status quo? Maj. slip op. at 17-18, n. 4. The State desired greater revenue, but not at the County's expense.

The Majority opinion finds succor for its view that S.B. 662 was not intended to have any effect on the state agricultural land transfer tax collection and distribution at the local level because, had that not been the case, the Fiscal and Policy Note for S.B. 662

2

would have addressed surely such a contrary consequence. Maj. Slip. Op. at 18-19 and n.5. It is true certainly that the Fiscal and Policy Note does not mention that it was expected that the change would result in diminution of the County's revenue share, regardless of the tandem operation of the tax ceiling. My intuition and experience with State and local government over 45 years of practice (the last 24 of which were as a Judge) suggests, however, that, had the result in the present case been a foreseeable consequence of the revised scheme, the Note would have addressed it and Bloody Hell would have been raised by MACO and any affected constituent jurisdiction. That did not occur. As the Majority opinion implies, MACO embraced SB 662 in 2008. Maj. slip op. at 19-20. Of course, everyone back then could have been operating under a misapprehension about the logical extension in actual operation of S.B. 662 within the pre-existing statutory scheme. There is no evidence of that either, however. For that reason, I am persuaded by the absence in the legislative history of SB 662 of any indicia that the imposition of the 25% surcharge, even with the tax ceiling, was intended to be part of the tax rate and, thus, the Majority's construction in the present case resulted improperly in a refund due to Phillips from the County.

I would answer the certified question sent to us by the Court of Special Appeals "No," reverse the judgment of the Circuit Court for Montgomery County, and direct remand of the case to the Circuit Court for entry of a judgment affirming the Tax Court's decision.

Judge Greene authorizes me to state that he joins the views expressed in this dissent.

3