## LABOR & EMPLOYMENT

### SICK AND SAFE LEAVE – WHETHER EMPLOYERS MAY APPLY ABSENCE CONTROL POLICIES TO PREVENT ABUSE OF SICK AND SAFE LEAVE

September 5, 2019

*The Honorable Dereck E. Davis*
*Maryland House of Delegates*

You have asked for our opinion about the extent to which the Maryland Healthy Working Families Act (the "Act"), *see* Md. Code Ann., Labor & Empl. ("LE") §§ 3-1301 to 3-1311, permits certain employers to apply absence control policies to prevent abuse of "sick and safe" leave under the Act. Absence control policies, sometimes called attendance management or absence management policies, are a tool that many employers use to deter absenteeism. These policies come in different forms, but the term often refers to policies that assign employees a "point" or an "occurrence" for each absence and that can lead to discipline if an employee accumulates a certain number of points within a certain period. Although the Act prohibits an employer from "apply[ing] an absence control policy that includes earned sick and safe leave absences as an absence that may lead to or result in an adverse action being taken against an employee," LE § 3-1309(c)(3), the Act also states in a separate provision that it "may not be construed" to "prohibit an employer from adopting and enforcing a policy that prohibits the improper use of earned sick and safe leave, including prohibiting a pattern of abuse of earned sick and safe leave." LE § 3-1302(b)(5). In essence, as we understand it, your question is how those two provisions should be read together.

In our opinion, the Act does not permit an employer to apply an absence control policy, including one that assigns points to an employee's absence, in a way that could lead to or result in adverse action for the legitimate use of sick and safe leave taken in accordance with the Act. An employer may, however, apply an absence control policy (or some other disciplinary policy) to penalize the actual abuse or improper use of leave under the Act, such as when the employer can demonstrate that the employee used leave for reasons not permitted under the Act or that the employee otherwise engaged in a pattern of abuse of leave under the Act.

# I
# Background

## *A.   Statutory Background*

During the 2017 legislative session, the General Assembly passed the Maryland Healthy Working Families Act.  *See* H.B. 1, 2017 Leg., Reg. Sess.  After the Governor vetoed the bill, the General Assembly overrode the veto at the beginning of the 2018 legislative session, and the statute went into effect on February 11, 2018.  *See* 2018 Md. Laws, ch. 1; *see also* Md. Const., Art. II, § 17(d).  We summarized the provisions of the Act in detail in an opinion issued just last year.  *See* 103 *Opinions of the Attorney General* 18 (2018).  Rather than repeat that summary here, we focus on the provisions most relevant to your inquiry.

Under the Act, an employer with 15 or more employees generally must provide its employees with paid "sick and safe leave," while an employer with 14 or fewer employees is instead generally required to provide unpaid leave.  LE § 3-1304(a).[1]  That leave, both paid and unpaid, "shall accrue at a rate of at least 1 hour for every 30 hours an employee works."  LE § 3-1304(b).  Employees may then use accrued leave for one of a series of enumerated purposes that are outlined in LE § 3-1305(a), including to treat the employee's own illness, to care for an ill family member, or to obtain preventive medical care.  *See* 103 *Opinions of the Attorney General* at 21 (listing those purposes).  When an employer's "existing paid leave policy" provides for paid time off (such as vacation days, sick days, parental leave, etc.) that can be used for sick and safe leave and also "permits an employee to accrue and use leave under terms and conditions that are at least equivalent to the earned sick and safe leave provided for under" the Act, the Act may not be construed to "require an employer to modify [that] existing paid leave policy."  LE § 3-1302(b)(2).[2]

---

[1]   Some employers and employees are excluded from the scope of the Act.  *See* 103 *Opinions of the Attorney General* at 22-23 (summarizing some of those exclusions).  When we refer to employers and employees in this opinion, we do not mean to include those to whom the Act does not apply.

[2]   In addition, "if a unit of State or local government's sick leave accrual and use requirements meet or exceed the sick and safe leave provided for under [the Act]," the State or local government employees "who are part of the unit's personnel system are subject to the

The Act places an obligation on the employee to provide advance notice to the employer when the need for the leave is "foreseeable"; when the need for leave is not foreseeable, the employee need only provide notice as soon as practicable. LE § 3-1305(b)(2). If an employee "fails to provide" the required notice, the employer may deny the employee's request to use accrued sick and safe leave if "the employee's absence will cause a disruption to the employer." LE § 3-1305(b)(3). The employer may not, however, require that an employee provide verification that the sick and safe leave was used appropriately unless the employee uses the leave for more than two consecutive shifts. LE § 3-1305(g)(1)(i).[3] If an employee refuses to provide the required verification, the employer may deny a subsequent request to use earned sick and safe leave for the same reason. LE § 3-1305(g)(2).

Of particular relevance here, the Act provides that it "may not be construed" to "prohibit an employer from adopting and enforcing a policy that prohibits the improper use of earned sick and safe leave, including prohibiting a pattern of abuse of earned sick and safe leave." LE § 3-1302(b)(5). But, as noted above, an employer may not "apply an absence control policy that includes earned sick and safe leave absences as an absence that may lead to or result in an adverse action being taken against an employee." LE § 3-1309(c)(3).[4] An employer also may not "take adverse action or discriminate against an employee because the employee exercises in good faith the rights protected under" the Act and may not "interfere with, restrain, or deny the exercise by an employee of any right provided for under" the Act. LE § 3-1309(c)(1), (2). For purposes of those anti-retaliation provisions, "adverse action" is defined to include "discharge," "demotion," "threatening the

[governmental] unit's law, regulations, policies, and procedures" for "accrual and use of sick leave," "grievances," and "disciplinary actions," rather than subject to the relevant provisions in the Act. LE § 3-1303(c).

[3]  The law also provides that an employer may require an employee to provide verification that leave was used appropriately if the employee used the leave between the first 107 and 120 days that the employee worked for the employer and the employee agreed to provide such verification at the time of hire. LE § 3-1305(g)(1)(ii). During the "first 106 calendar days the employee works for the employer," an employer is not required to allow an employee to use sick and safe leave. LE § 3-1304(c)(4).

[4]  There are at least a few other states that have similar prohibitions on the use of "absence control polic[ies]" to penalize employees for using sick leave. *See* Ariz. Rev. Stat. Ann. § 23-374; Cal. Lab. Code § 234; D.C. Code Ann. § 32-531.08; Or. Rev. Stat. Ann. § 653.641.

employee with discharge or demotion," and "any other retaliatory action that results in a change to the terms or conditions of employment that would dissuade a reasonable employee from exercising a right under" the Act. LE § 3-1309(a).

## B. *Legislative History*

The Act was originally introduced as House Bill 1 at the beginning of the 2017 legislative session. As introduced, the bill included the same prohibition that now appears in LE § 3-1309(c)(3) against applying an absence control policy that may result in adverse action taken against an employee for using sick and safe leave. The original bill also provided that the Act could not be construed to "prohibit an employer from adopting a policy that limits an employee to using earned sick and safe leave only for the reasons listed in § 3-1305(a) of this subtitle." *See* H.B. 1 (first reader). During the hearings on the bill, several employers expressed concern that the proposed limitations on employers' ability to require verification of leave usage and to apply absence control policies might lead to abuse. *See, e.g.*, *Hearing on H.B. 1 Before the House Econ. Matters Comm.*, 2017 Leg., Reg. Sess. (Feb 10, 2017) (written testimony of the University System of Maryland); *id.* (written testimony of the Maryland Chamber of Commerce); *see also Hearing on S.B. 230 Before the Senate Finance Comm.*, 2017 Leg. Reg. Sess. (Feb. 9, 2017) (written testimony of the Maryland Chapter of the Associated General Contractors of America).[5]

Following the bill hearings, the House Economic Matters Committee amended the provision that allowed an employer to adopt "a policy that limits an employee to using earned sick and safe leave only for the reasons listed in § 3-1305(a) of this subtitle" to instead provide (as does the final version) that the Act may not be construed to preclude an employer from adopting and enforcing a policy that "prohibits the improper use of earned sick and safe leave, including prohibiting a pattern of abuse of earned sick and safe leave." Committee Amendments to H.B. 1, House Econ. Matters Comm. (Feb. 27, 2017). The General Assembly did not, however, make any change to the provision prohibiting the application of an absence control policy to sick and safe leave absences when that application may lead to adverse action against an employee.

---

[5] Senate Bill 230 was the cross-filed version of House Bill 1.

### C.   *Absence Control Policies*

As noted above, absence control policies come in many different forms.   Although it is not possible to provide a comprehensive summary of what such policies might entail, they generally provide for some type of discipline when employees are absent or tardy under certain conditions or for a certain number of days.   For example, the term is often used to refer to so-called "no-fault" attendance policies under which an employer assigns "points" or "occurrences" to employee absences—or at least to particular types of absences, such as unexcused or unplanned absences—regardless of the reason for the absence.   Once an employee has accumulated a certain number of points or occurrences within a set period of time (often a year), the employee may be subject to progressive discipline, including a warning, suspension, or even termination.   *See, e.g.*, *McCarther v. Pacific Telesis Grp.*, 48 Cal. 4th 104, 107-08 (2010) (summarizing one example of a no-fault policy); Nathan W. Powell, *The Absence of Control: Employers' Inability to Apply Family Sick Leave to Absence Control Policies*, 34 McGeorge L. Rev. 451, 452 (2003) (same); Robert J. Aalberts, *Employee Notice Requirements Under the Family and Medical Leave Act: Are They Manageable?*, 24 Pepperdine L. Rev. 1209, 1221 (1997) (same).   However, not all absence control policies follow that same model; an employer might choose to use a points-based system that takes into account the type of leave used and the reasons for the leave, *see, e.g.*, *Galante v. Sandoz, Inc.*, 192 N.J. Super. 403, 405 (1983) (summarizing an absence control policy with exceptions for certain types of leave), or might choose not use a points-based system at all.

### D.   *2019 Legislative Session - House Bill 686*

During the 2019 session, the General Assembly considered a bill that would have amended the Act to allow an employer to apply an absence control policy under specified circumstances.   More specifically, the amendment would have allowed employers to apply an absence control policy if the employer provides at least 40 hours of paid leave in a year, excluding earned sick and safe leave, and the absence control policy (i) is uniformly applied to all types of leave offered by the employer; (ii) is provided to an employee in writing; (iii) has a progressive accountability structure; and (iv) provides a warning to an employee before any possible action is taken against the employee.   H.B. 686, 2019 Leg., Reg. Sess. (first reader).

The majority of the employer representatives who testified in support of House Bill 686 were from hospitals or hospital associations. *Hearing on H.B. 686 Before the House Econ. Matters Comm.*, 2019 Leg., Reg. Sess. (Feb. 19, 2019). These hospital employers testified that, since the Act's effective date in 2018, they had seen an increase in unplanned absences, particularly before and after holidays and long weekends. *Id.* For example, Johns Hopkins Hospital stated that it had experienced an additional 38,247 hours of unscheduled absences in the second quarter of fiscal year 2019 compared to the same quarter in fiscal year 2018 prior to the Act going into effect. *Id.* (written testimony of Johns Hopkins Hospital). The hospital attributed the increase to "the law's prohibition on using a no-fault attendance management policy." *Id.*[6]

Opponents of the bill testified that the statute already included a number of safeguards to prevent abuse of sick and safe leave under the Act—including the provision in LE § 3-1302(b)(5) that allows employers to adopt policies prohibiting improper use and patterns of abuse of leave—and that, therefore, the proposed bill was not necessary. *See, e.g.*, *id.* (written testimony of the Public Justice Center); *id.* (written testimony of the Women's Law Center of Maryland). Ultimately, the bill did not pass and was referred by the Economic Matters Committee for further study during the interim between legislative sessions. As Chair of the Economic Matters Committee, you have sought our opinion on the interpretation of LE §§ 3-1309(c)(3) and 3-1302(b)(5).

## II

### Analysis

You have asked whether employers, including employers with existing paid leave policies, may apply absence control policies to curtail alleged abuse of "sick and safe" leave under the Act. The "cardinal rule" of statutory construction is, as always, "to ascertain and effectuate the intent of the Legislature." *Stickley v. State Farm Fire & Cas. Co.*, 431 Md. 347, 358 (2013) (internal quotation marks omitted). Like the Maryland courts, "we begin with the normal, plain meaning of the statute," *State v. Bey*, 452 Md. 255, 265 (2017) (internal quotation marks omitted), reading

---

[6] We take no position on whether the increase in unplanned absences is in fact due to abuse of the Act or whether, as others have urged, that increase is merely evidence that the Act is working as intended by allowing employees to take unplanned absences for legitimate reasons when necessary.

the statute's words in accordance with "their natural and ordinary meaning," *Davis v. State*, 426 Md. 211, 218 (2012). We also interpret that language in light of "the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *Lockshin v. Semsker*, 412 Md. 257, 276 (2010). When the statutory language, read in context, "is unambiguous and clearly consistent with the statute's apparent purpose," the inquiry "ordinarily" ends. *Id.* at 275. When, however, "true legislative intent cannot be readily determined from the statutory language alone," we turn to other sources of legislative intent, such as the "structure of the statute," the "legislative history," "the general purpose behind the statute," and "the relative rationality and legal effect of various competing constructions." *Montgomery County v. Phillips*, 445 Md. 55, 63 (2015).

With those principles in mind, we start our analysis with the plain language of the statute. The language of LE § 3-1309(c)(3), at least at first blush, is clear: An employer may not "apply an absence control policy that includes earned sick and safe leave absences as an absence that may lead to or result in an adverse action being taken against an employee." Under the plain language of that provision, an employer may not count a sick or safe leave absence toward any disciplinary action that might be taken pursuant to an absence control policy. Thus, under an absence control policy that uses "points" or "occurrences," the employer may not assign a "point" or "occurrence" to an absence that the employee was entitled to take under the Act. Even though the employee's use of sick and safe leave in a particular instance might not result in any *immediate* adverse action, the statute makes clear that any consequence that eventually "may lead to" an adverse action in the future, such as the assignment of a point, is prohibited. LE § 3-1309(c)(3).

The question, then, is whether LE § 3-1302(b)(5)—which provides that the Act "may not be construed to . . . prohibit an employer from adopting and enforcing a policy that prohibits the improper use of earned sick and safe leave, including prohibiting a pattern of abuse of earned sick and safe leave"—allows an employer to apply an absence control policy in a way that would otherwise be prohibited under § 3-1309(c)(3). When, as here, two provisions of the same statutory scheme could be viewed as in conflict with each other, we must attempt to "read [the provisions] together," that is, interpret them "with reference to one another," and harmonize them, "to the extent possible, both with each other and with other provisions of the statutory scheme." *Government*

*Employees Ins. Co. v. Insurance Comm'r*, 332 Md. 124, 132 (1993) (internal citations omitted); *see also Maryland-Nat'l Capital Park & Planning Comm'n v. Anderson*, 395 Md. 172, 200 (2006) (explaining that the courts "read together statutes on the same subject and harmonize them to the extent possible").

In this case, the two provisions at issue can be easily harmonized. Although § 3-1302(b)(5) provides that the Act "may not be construed to" preclude employers from adopting and enforcing policies to prohibit the improper use or abuse of sick and safe leave, many absence control policies—at least as we understand them—go much further than merely prohibiting the improper use or abuse of leave. Rather, such policies (especially no-fault policies) may apply to an absence regardless of the reason for the leave and regardless of whether the employee complied with the Act in taking that leave. Thus, the fact that the Act "may not be construed" to prevent an employer from adopting a policy that prohibits improper use or abuse of sick or safe leave does not in any way suggest that an employer may apply an absence control policy to all sick and safe leave absences, even when there is no evidence that the employee in question has engaged in any improper use or pattern of abuse of leave.

In fact, if employers could apply absence control policies indiscriminately to all sick and safe leave absences, even when the employee is legitimately using the leave, that interpretation would effectively eviscerate the Act's anti-retaliation protections by chilling the legitimate use of leave under the Act. What is more, interpreting the statute to allow absence control policies to be applied to the legitimate use of sick and safe leave would render LE § 3-1309(c)(3) largely meaningless by permitting employers to apply absence control policies in the precise way that the provision says that they cannot. *See Anderson*, 395 Md. at 200 (explaining that, when harmonizing two related provisions, courts must "avoid rendering either [provision] or any portion of [the provision], meaningless, surplusage, superfluous or nugatory" (internal quotation marks omitted)). The plain language of the Act, read as a whole and in light of its broad remedial purposes, *see* 103 *Opinions of the Attorney General* at 34-35, demonstrates that the Legislature did not intend to authorize employers to use absence control policies in such an overbroad and indiscriminate way.

That conclusion applies equally to "existing paid leave polic[ies]" under § 3-1302(b)(2) of the Act. To be sure, that provision states that the Act does not "require an employer to

modify an existing paid leave policy" when the policy "permits an employee to accrue and use leave under terms and conditions that are at least equivalent to the earned sick and safe leave provided for under" the Act. LE § 3-1302(b)(2). But even assuming that an absence control policy could be considered part of the employer's "paid leave policy," as opposed to a separate policy, the "terms and conditions" of that paid leave policy would not be "equivalent to" those in the Act if they were to allow employers to apply an absence control policy to sick and safe leave absences in a manner that is expressly and specifically prohibited by the Act. Although the Act provides that "the terms and conditions of a paid leave policy shall be presumed to be equivalent" if they allow an employee to "access and accrue paid leave" at the same or greater rate than under the Act and to "use the paid leave for the purposes" provided for in the Act, LE § 3-1302(c), that presumption is just that—a presumption— and it would not hold in the face of an absence control policy that penalizes employees for using their leave in a way that the Act is intended to protect.[7]

We do not mean to suggest, however, that an employer is powerless to curtail abuse of sick and safe leave under the Act. For example, under an absence control policy that uses "points" or "occurrences," an employer could likely assign a point to an absence when the employee actually engaged in improper use or a pattern of abuse of leave under the Act, such as if the employee took sick and safe leave for an impermissible reason, *see* LE § 3-1305(a); the employee had already exhausted his or her sick and safe leave, *see* LE § 3-1304(c)[8]; or the employee failed to provide

---

[7] To the extent that government employers in Maryland have absence control policies, it is possible that the analysis would be different for the category of government employers with "sick leave accrual and use requirements" that "meet or exceed the sick and safe leave provided for under" the Act. LE § 3-1303(c). For those employers, the Act provides that the employees "who are part of the unit's personnel system" are generally "subject to the unit's law, regulations, policies, and procedures" for "disciplinary actions," rather than subject to the relevant provisions of the Act. *Id.* Although we do not address that question definitively here, we note that there is at least some ambiguity about how LE § 3-1309(c)(3) would apply to some government employers and employees.

[8] Technically, when an employee has already exhausted his or her sick and safe leave, that absence—rather than constituting the "improper use" of sick and safe leave per se—might not even qualify as a "sick and safe leave absence" under LE § 3-1309(c)(3) in the first place. Either way, an employer could likely apply an absence control policy to an

the necessary verification that the leave was used appropriately under conditions when verification was required under the Act, *see* LE § 3-1305(g).[9]  That reading harmonizes §§ 3-1309(c)(3) and 3-1302(b)(5) by permitting the use of an absence control policy under limited circumstances when the absence was the result of actual improper use or patterns of abuse of sick and safe leave but otherwise prohibiting absence control policies as an overbroad tool to discipline employees for the legitimate use of sick and safe leave.[10]

Alternatively, rather than trying to apply a points-based absence control policy to sick and safe leave absences, an employer could adopt and enforce a different type of policy—whether framed as an absence control policy or as a separate disciplinary policy—that specifically targets the improper use or abuse of sick and safe leave.  Given that the Act permits employers to adopt and enforce policies that "prohibit[] the improper use of earned sick and safe leave," including "pattern[s] of abuse" of that leave, LE § 3-1302(b)(5), an employer could likely adopt that type of policy, so long as it penalizes actual improper use, or actual patterns of abuse, of leave under the Act, not the legitimate use of sick and safe leave.

---

absence once the employee has exhausted his or her sick and safe leave. *See* Maryland Dep't of Labor, Licensing & Regulation, *Maryland Healthy Working Families Act: Frequently Asked Questions* (March 9, 2018), http://www.dllr.state.md.us/paidleave/paidleavefaqs.pdf ("After an employee has exhausted all of the leave that he or she is entitled to use under the earned sick and safe leave law, then an employer could apply its normal attendance policies to any absences taken after the leave has been exhausted.").

[9]  This list of examples is not necessarily exhaustive.  There may be other actions that, depending on the circumstances, would constitute the improper use of, or a pattern of abuse of, sick and safe leave under the Act and for which an employer could assign a point or occurrence under an absence control policy.

[10]  In addition to this permissible use of an absence control policy, the Act also provides employers with other tools to help prevent abuse.  For instance, the Act specifically permits an employer to deny an employee's request to use sick and safe leave in certain situations when an employee fails to provide proper notice.  *See* LE § 3-1305(b)(3).  Similarly, when an employee fails to provide the required verification under the Act after missing two consecutive shifts, the statute permits an employer to deny an employee's request to use leave for the same reason.  *See* LE § 3-1305(g)(2).

To be clear, we cannot provide definitive guidance in the abstract about exactly what terms a hypothetical absence control policy or disciplinary policy might permissibly include or exactly how an employer might permissibly define "pattern[s] of abuse" in that hypothetical policy. As a practical matter, the Commissioner of Labor & Industry (the "Commissioner"), who is charged with administering the Act, may have to decide in each case whether the particular policy at issue is consistent with the Act's requirements. *See* LE § 3-1308 (outlining the enforcement process by which the Commissioner determines whether there has been a violation of the Act). To the extent that there is ambiguity in the statutory scheme, the Commissioner could also consider promulgating regulations to clarify the disciplinary policies that employers are allowed to adopt under the Act. *See* 103 *Opinions of the Attorney General* at 47 (noting that the Commissioner is empowered to adopt regulations to, among other things, clarify ambiguities in the statute).[11] But regardless of the specifics of any particular absence control policy or other disciplinary policy, the bottom line is that an employer may not apply such a policy to sick and safe leave absences in a manner that could lead to adverse action against an employee unless the employee actually used the leave improperly or actually engaged in a pattern of abuse of leave under the Act.

---

[11] We note that, under Oregon's sick leave law, "[i]f an employer suspects that an employee is abusing sick time, including engaging in a pattern of abuse, the employer may require verification from a health care provider of the need of the employee to use sick time, regardless of whether the employee has used sick time for" the minimum number of days for which verification is normally required. Or. Rev. Stat. § 653.626(3)(b). That law then defines "pattern of abuse" as including but not limited to "repeated use of unscheduled sick time on or adjacent to weekends, holidays, vacation days or paydays." *Id.* Somewhat similarly, the District of Columbia's sick leave law provides that "[n]othing in this subchapter shall prohibit an employer from establishing and enforcing a lawful policy relating to improper use of paid leave *or from seeking more frequent certifications from an employee if there is evidence of a pattern of abuse of paid leave.*" D.C. Code Ann. § 32-531.08(c) (emphasis added). We do not address here whether Maryland's statute could be interpreted to allow employers to impose similar verification requirements when an employee is engaging in a suspected pattern of abuse despite the language in LE § 3-1305(g)(1) that permits employers to require verification only when employees have missed two consecutive shifts or are within their first 120 days on the job. Of course, if the General Assembly so desires, it could amend the statute to clarify the meaning of "a pattern of abuse" as well as the extent to which an employer may ask for verification when there is some suspicion of a pattern of abuse.

Although we recognize that it may sometimes be difficult for an employer to know whether an employee has used sick and safe leave improperly, the General Assembly was confronted with that same argument during the hearings on the Act yet did not change the provision prohibiting employers from using absence control policies to penalize legitimate uses of leave. More specifically, the Maryland Chamber of Commerce had argued that the provision exempting sick and safe leave absences "from no fault attendance policies" would be "particularly problematic" and would "leave[] the door wide open for flagrant abuse of this leave" because employers would not be able to determine "if such absences were legitimate" and would have "no way to deter employees from fraudulent use" of their leave. *Hearing on H.B. 1* (written testimony of the Maryland Chamber of Commerce). In responding to those concerns, the Legislature could easily have amended the bill to allow employers to apply absence control policies broadly to all absences. Instead, it chose to amend the bill merely to allow employers to adopt policies prohibiting the improper use or abuse of sick and safe leave—a significantly narrower change. *See* Committee Amendments to H.B. 1, House Econ. Matters Comm. (Feb. 27, 2017). We must presume that the General Assembly meant what it said: Although employers may adopt and enforce policies that prohibit the actual improper use of sick and safe leave, including patterns of abuse of such leave, employers may not use absence control policies to penalize the legitimate use of leave under the Act.

### III
### Conclusion

For the reasons explained above, we conclude that an employer may not apply an absence control policy to a sick and safe leave absence in a manner that may lead to or result in adverse action against an employee for the legitimate use of sick and safe leave. That is, an employer may not apply an absence control policy (or other similar disciplinary policy) to a sick and safe leave absence unless the employer can demonstrate that the employee actually improperly used or otherwise engaged in a pattern of abuse of sick or safe leave under the Act.

Brian E. Frosh
Attorney General of Maryland

Patrick B. Hughes
Chief Counsel, Opinions and Advice